**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THE BELT RAILWAY COMPANY OF CHICAGO, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 18 C 7361 |
| v. | ) ) | Hon. Jorge L. Alonso |
| WEGLARZ HOTEL III, L.L.C., WEGLARZ HOTEL IV, L.L.C., WEGLARZ HOTEL V, L.L.C., and KATIE PAPADIMITRIU, CARRIE ZALEWSKI, U-JUNG CHOE, CYNTHIA SANTOS, and BRENDA CARTER, MEMBERS OF THE ILLINOIS POLLUTION CONTROL BOARD, IN THEIR OFFICIAL CAPACITIES AND NOT AS INDIVIDUALS, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, the Belt Railway Company of Chicago, brings this suit against Defendants, Weglarz Hotel III, L.L.C., Weglarz Hotel IV, L.L.C., Weglarz Hotel V, L.L.C., and all members of the Illinois Pollution Control Board,[1] seeking injunctive and declaratory relief on constitutional grounds effectively to bar defendants from enforcing state noise regulations. The parties have filed cross-motions for summary judgment, and Plaintiff has also filed a *Daubert* motion to strike Defendants' expert. For the reasons that follow, the Court grants in part and denies in part Defendants' motion for summary judgment. The Court denies both Plaintiff's motion for summary judgment and Plaintiff's *Daubert* motion.

---

[1] The PCB members named as defendants are Katie Papdimitriu, Carrie Zalewski, U-Jung Choe, Cynthia Santos, and Brenda Carter. The PCB member defendants are sued only in their official capacity.

## BACKGROUND

Plaintiff, the Belt Railway Company of Chicago ("BRC"), is a "private intermediate switching terminal railroad company" that operates a 786-acre "clearing yard" located just outside Chicago in the Village of Bedford Park, Illinois. (Pl.'s LR 56.1 Resp. at ¶¶ 2, 9, ECF No. 65.) BRC's clearing yard is used to sort freight trains. The clearing yard receives freight trains from various rail carriers from across the country, separates the trains and organizes the individual rail cars based on where the cars need to go next, and then forms new freight trains accordingly. (Defs.' LR 56.1 Resp. at ¶¶ 4-6, ECF No. 67.) This process is generally known as "switching." (*Id.* at ¶ 4.) BRC "plays a key role in the United States' rail network" because it is "the highest volume intermediate rail switching operation in North America," with thousands of rail cars passing through its clearing yard every day. (*Id.* at ¶¶ 8-10.)

Defendants, Weglarz's Hotel III, L.L.C., Weglarz Hotel IV, L.L.C., Weglarz Hotel V, L.L.C. (collectively "Weglarz"), together operate three hotels located on the southwest side of Chicago. (ECF No. 65 at ¶¶ 1, 6.) The hotels are located just north of the eastern portion of BRC's clearing yard, or more specifically, just north of BRC's "East Classification Yard." (*Id.* at ¶ 10.)

At its clearing yard, BRC uses a sophisticated system of what are known as "retarders," which are pieces of safety equipment used to slow down rail cars as they are sorted; their purpose is to prevent rail cars from colliding, derailing, or otherwise striking an employee or property. (ECF No. 67 at ¶¶ 19-21.) BRC uses two types of retarders: "active retarders" and "inert retarders." (ECF No. 65 at ¶¶ 13-14.) An inert retarder is a steel, spring-loaded device placed along the tracks that squeezes a rail car's wheels as the rail car moves through it, thereby slowing the rail car down. (ECF No. 67 at ¶¶ 19-21.) The resulting friction creates a certain squealing sound. (ECF No. 65 at ¶ 14.)

2

Sometime between 2013 and 2015, BRC began installing a second set of inert retarders on certain tracks in its East Classification Yard. (*Id.* at ¶¶ 15-16.)[2] This project was prompted by a guidance memorandum issued by the Federal Railroad Authority in March 2010, but BRC's choice to install a second set of inert retarders was discretionary. The guidance memorandum did not require the project. (*Id.* at ¶¶ 18-19.)

In the spring of 2014, Weglarz's staff and guests began complaining of excessive noise; this was the first time Weglarz received such complaints since it opened its hotels. (*Id.* at ¶ 20.) Weglarz retained a noise expert, Bowlby and Associates, Inc., which conducted an investigation and issued a report; the report concluded that BRC's use of its double inert retarders was violating noise emission standards set by regulations promulgated under the Illinois Environmental Protection Act ("IEPA"). (*Id.*)

In 2018, Weglarz filed a complaint before the Illinois Pollution Control Board ("PCB"), which is responsible for enforcing the IEPA. (*See id.* at ¶¶ 3, 23; *see also* Pl.'s Compl., Ex. B at 12-16, ECF No. 1.) In its complaint, Weglarz alleges that BRC has violated the applicable noise emissions standards through its use of double inert retarders. (ECF No. 65 at ¶¶ 11-13, 24.) Weglarz's complaint asks the PCB: (1) to find that BRC violates the IEPA and has created a public nuisance through violations of the IEPA and its regulations; (2) to direct BRC to stop using inert retarders in its East Classification Yard in a manner that violates the IEPA; and (3) to impose civil penalties, as permitted by the IEPA. (*Id.* at ¶ 25.)

---

[2] BRC technically uses "double inert retarders" and has for some time. Between 2013 and 2015, BRC installed an additional set of double inert retarders, which together are referred to as "double double inert retarders." For clarity's sake, the Court refers to each set of double inert retarders simply as inert retarders. When the Court refers to double inert retarders, it means BRC's use of two sets of double inert retarders.

Before the PCB adjudicated Weglarz's complaint,[3] BRC filed the instant suit before this Court, naming as defendants Weglarz and all members of the PCB in their official capacity. BRC seeks declaratory and injunctive relief against defendants, arguing that any action by the PCB on Weglarz's Complaint is preempted by the Interstate Commerce Commission Termination Act("ICCTA"), 49 U.S.C. § 10501(b) (Count I), or in the alternative, would violate the U.S. Constitution's Commerce Clause, Art. I, § 8. (ECF No. 1 at ¶¶ 16-30.) BRC and Weglarz now file cross-motions for summary judgment as to the ICCTA preemption issue, and Weglarz also moves for summary judgment on BRC's claim relating to the Commerce Clause. (*See generally* Pl.'s Mot. for Summary Judgment, ECF No. 57; *see also* Defs.' Mot. for Summary Judgment, ECF No. 53.) The PCB defendants take no position on the merits of BRC's claims here. (*See* ECF No. 32 at 1-2.)[4]

## **LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed.

---

[3] The PCB stayed proceedings on Weglarz's Complaint in January 2019, pending the resolution of this case. (*See* ECF No. 32 at 1.) Although the parties do not address the issue, the Court notes that BRC has standing here to bring its claims. In particular, regarding the injury-in-fact requirement, even assuming Weglarz's Complaint before the PCB itself does not suffice, BRC need not wait for an adverse ruling from the PCB to have standing to bring the instant suit. *See Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 802 (7th Cir. 2016) (noting pre-enforcement actions are permissible); *see also Mainstreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 744-45 (7th Cir. 2007). Further, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337.

[4] In explaining they take no position on the merits of BRC's claims, the PCB members also moved to be excused from filing an answer or otherwise actively participating in this case (despite remaining named defendants). (*See* ECF No. 32 at 1-2.) The Court granted the unopposed motion. (*See* ECF No. 37.)

4

2d 202 (1986). At the summary judgment stage, a court does not make credibility determinations, weigh evidence, or decide which inferences to draw from the facts; those are jury functions. *See Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014). Rather, a court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014). The Court applies these "ordinary standard for summary judgment" in the same way whether one or both parties move for summary judgment; when the parties file cross-motions, the Court treats each motion individually, "constru[ing] the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017); *see Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

## DISCUSSION

In Count I of the complaint, BRC asks this Court to enjoin any potential state action by defendants that would affect BRC's use of double inert retarders in its clearing yard on the grounds that such action is preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), 49 U.S.C. § 10501(b). Both parties move for summary judgment on Count I, and Weglarz also moves for summary judgment on Count II, in which BRC also asks the Court to enjoin any action by defendants on the alternative grounds that such action would violate the Commerce Clause, Art. I, § 8. The Court addresses each count and then turns to BRC's *Daubert* motion to strike Weglarz's expert, Ralph Lee Meadows.

## I. Preemption

The Supremacy Clause of the United States Constitution states the Constitution and federal laws are "the supreme Law of the Land . . . Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. In other words, federal law "preempts state laws that interfere with, or

are contrary to, federal law." *Union Pac. R. Co. v. Chicago Transit Auth.*, 647 F.3d 675, 678 (7th Cir. 2011) (quoting *Boomer v. AT&T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002)).

The ICCTA, like many federal statutes, contains an express preemption provision that delineates the extent to which it preempts state law. The ICCTA created the Surface Transportation Board ("STB") and conferred upon the STB exclusive jurisdiction over the regulation of "rail transportation." 49 U.S.C. § 10501(b). "Transportation" is defined broadly to include any "property, facility, instrumentality, or equipment of any kind related to the movement of . . . property . . . by rail . . . ." 49 U.S.C. § 10102(9)(A). The ICCTA further states that "the remedies provided under [49 U.S.C. §§ 10101-11908] with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b).

Seizing on this language, BRC contends summary judgment on Count I is appropriate because § 10501(b) of the ICCTA preempts state enforcement of the IEPA and its noise regulations. Weglarz, on the other hand, argues summary judgment in their favor is appropriate for either of two reasons. First, Weglarz argues that the federal Noise Control Act ("NCA"), 42 U.S.C. § 4901 *et seq.*—not the ICCTA—governs the preemption analysis and that the NCA does not preempt the PCB from enforcing state noise regulations. Second, Weglarz argues that, even if the ICCTA governs, it does not preempt the PCB from acting under these circumstances. The Court first addresses the relationship between the NCA and ICCTA before turning to the parties' arguments regarding ICCTA preemption.

A.     **Noise Control Act**

The NCA and its implementing regulations set noise emission standards for rail cars moving in interstate commerce. *See* 42 U.S.C. § 4916; *see also* 49 C.F.R. § 210.1 *et seq.*; 40 C.F.R. § 201.10 *et seq*. The NCA also contains its own preemption provision, which states:

> [N]o State or political subdivision thereof may adopt or enforce any standard applicable to noise emissions from the operation of [any equipment or facility of a surface carrier engaged in interstate commerce by railroad] unless such standard is identical to a standard applicable to noise emissions resulting from such operation prescribed by any regulation [promulgated under the NCA].

42 U.S.C. § 4916(c)(1). As Weglarz points out, the NCA's implementing regulations specifically state that NCA noise emission standards do *not* apply to inert retarders. 49 C.F.R. § 210.3(b)(6).

Relying on these provisions, Weglarz argues essentially as follows: even assuming the ICCTA would preempt the PCB's enforcement of state noise regulations, the ICCTA's regulatory regime overlaps with the NCA's regulatory regime. (*See* Defs.' Memo. in Support of Summary Judgment at 6-10, ECF No. 56.) Because they overlap, this Court must attempt to harmonize these two statutes, and relevant case law and STB decisions show that enforcement of Illinois noise regulations more appropriately falls within the NCA's purview. (*Id*. at 9-10.) Weglarz argues that, because the NCA specifically allows for state regulation of inert retarders, PCB enforcement of state noise regulation is not preempted here, and, according to Weglarz, the ICCTA's preemption clause is irrelevant. (*Id*.)

The Court disagrees. As the parties note, there is almost no case law discussing the interplay between the ICCTA and the NCA. BRC raises one district court decision briefly touching on the issue. *Nottke v. Norfolk Southern Ry. Co.*, 318 F. Supp. 3d 1036, 1040-41 (N.D. Ohio 2018). *Nottke* provides limited analysis and, as Weglarz points out, addresses active retarders, which are treated differently under the NCA. *Id*. The Court does not rely on *Nottke* but does agree with its succinct observation that the NCA is not "an affirmative grant of power to the states to regulate rail carriers" and that "there is no true conflict between [the NCA and ICCTA]." *Id*. at 1041. In other words, and more to the point here, the NCA's regulatory reach does not encompass inert retarders, so the NCA does not affect the ICCTA preemption analysis.

In arguing to the contrary, Weglarz relies on cases and STB decisions discussing the interplay of the ICCTA and other federal statutes, like the Federal Railway Safety Act ("FRSA") or environmental statutes like the Clean Air Act ("CAA"). (ECF No. 56 at 9-11.) But the Court finds the regulatory regimes under statutes like the FRSA and CAA are materially different from the NCA's regulatory regime under these circumstances, and therefore Weglarz's cases shed little light on how the ICCTA and NCA interact.

For example, the CAA mandates that states create certain rules relating to air pollution and, if approved by the EPA, these rules "have the force and effect of federal law." *See Ass'n of Am. Railroads v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1096 (9th Cir. 2010); *see also Indiana v. EPA*, 796 F.3d 803, 804 (7th Cir. 2015) (describing regulatory regime). To the extent these state rules effectively manage or govern railway transportation, they trigger the ICCTA's preemption clause, and because these state rules are part of the CAA regulatory framework, this creates an apparent conflict between the CAA and ICCTA. In light of this conflict, "the courts must strive to harmonize the two laws, giving effect to both laws if possible." *Ass'n of Am. Railroads*, 622 F.3d at1097-98 (ultimately finding that because state rules at issue had not yet been approved by the EPA, they did not have force of federal law and "there is no authority for the courts to harmonize the [state] rules with ICCTA").

Similarly, the FRSA, which governs rail safety, grants substantial authority to states to regulate. The FRSA's preemption clause explicitly provides a role for states to supplement federal regulations with their own rules. *See* 49 U.S.C. § 20106 ("A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the state requirement."). Courts interpreting this language have found that a state rule regulating rail safety is therefore part of the

FRSA's regulatory regime (assuming there is no federal regulation promulgated under the FRSA covering the same subject). *See Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 521 (6th Cir. 2001); *see also Iowa, Chicago & E. R.R. Corp. v. Washington Cty., Iowa*, 384 F.3d 557, 559-61 (8th Cir. 2004); *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 108 (2d Cir. 2009). Where such state rules trigger the ICCTA's preemption clause, these courts find the ICCTA and the FRSA overlap; to avoid a conflict, courts find that Congress intended the two statutes to be construed *in pari materia* and that the ICCTA does not preempt state rules relating to railroad safety because such rules fall under the FRSA's regulatory umbrella, which has "primary authority" over rail safety matters. *See Tyrrell*, 248 F.3d at 523.[5]

The NCA's regulatory regime differs from the regulatory regimes of the FRSA or other federal environmental statutes, and accordingly, the Court finds there is no conflict between the NCA and ICCTA here. Unlike the CAA or similar statutes, the NCA does not mandate that states craft or implement noise regulations nor does it grant state noise regulations the force and effect of federal law, and unlike the FRSA, which explicitly makes room for state rules in the federal regulatory framework, the NCA's preemption provision merely says that a state *cannot* adopt or enforce noise emission standards relating to rail carriers unless the state standards are identical to federal regulations promulgated under the NCA. 42 U.S.C. § 4916(c)(1). In short, the NCA's

---

[5] In so finding, these courts had the benefit of amici briefs filed by the United States and the STB in *Tyrell*, both of which took the position that the ICCTA and FRSA overlapped and needed to be read *in pari materia*. *Tyrrell*, 248 F.3d at 521; *see also Washington Cty., Iowa*, 384 F.3d at 560. In support of its position in *Tyrrell*, the STB leaned on a rulemaking plan it drafted with the Federal Railroad Authority (tasked with implementing the FRSA) which laid out the overlap between the ICCTA and FRSA and how the agencies harmonized that overlap. *See SIPS Rulemaking*, 63 Fed. Reg. 72225-72226; *Tyrrell*, 248 F.3d at 523. Here, the parties do not offer—and the Court has not found—any similar materials with respect to the ICCTA and NCA.

preemption provision is *not* "an affirmative grant of power to the states to regulate rail carriers." *Nottke*, 318 F. Supp. 3d at 1041.[6]

The relevant rulemaking history by the Environmental Protection Agency ("EPA") further supports the conclusion that the NCA does not confer regulatory authority to the states here. In exempting inert retarders from regulation, the EPA explained that "inert retarders generally create lower noise levels and much less frequent squeals than the other types of retarders [that are covered by regulation]. Consequently, EPA is not proposing a specific noise source standard for inert retarders." 44 Fed. Reg. 22960, 22964 (Apr. 17, 1979). In other words, the EPA did not view inert retarders as a problem worth regulating. Things might be different if the EPA purposefully left to states the task of filling the regulatory gap, but if that were the case, the EPA likely would have said so. *See e.g., S. Pac. Transp. Co. v. Pub. Util. Comm'n*, 9 F.3d 807, 812 n.4 (9th Cir. 1993) (citing EPA rulemaking history that explicitly left regulation of train whistles to state and local authorities "who are better able to evaluate the particular local circumstances . . . and the requisite safety considerations involved").

The Seventh Circuit instructs that "[w]hen addressing the interactions of federal statutes, courts are not supposed to go out *looking* for trouble." *Lewis v. Epic Sys. Corp.*, 823 F.3d 1147, 1158 (7th Cir. 2016). Weglarz asks the Court to do just that by essentially urging it to find the NCA bestows federal weight on state rules relating to noise emissions. But again, neither the NCA's statutory language nor its relevant regulations evidence an intent to fit state regulation of inert retarders into the NCA regulatory regime. So, at least under the circumstances here, there is

---

[6] The NCA's preemption provision does permit a state to establish and enforce its own noise emissions standards but *only* if the EPA first "determines such standard . . . is necessitated by special local conditions and is not in conflict with regulations promulgated under this section." 42 U.S.C. § 4916(c)(2). Weglarz makes no argument regarding if and how § 4916(c)(2) applies here.

no conflict nor overlap between the NCA and the ICCTA. Accordingly, the Court now turns to whether the ICCTA preempts Weglarz's complaint before the PCB.

### B.  ICCTA Preemption

"In determining preemption, we look to Congress's intent in enacting the federal statute at issue." *Chicago Transit Auth.*, 647 F.3d at 678. A court discerns Congress's intent from the statute's text, the statutory framework, and the "reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Union Pac. R. Co. v. Chicago Transit Auth.*, No. 07-CV-229, 2009 WL 448897, at *4 (N.D. Ill. Feb. 23, 2009) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S. Ct. 2240, 2250-51 (1996)). Where, as here, the statute contains an express preemption provision, the plain wording of the clause "contains the best evidence of Congress's preemptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S. Ct. 1732, 1737 (1993).

Again, §10501(b) provides the ICCTA's express preemption provision and states:

 (b) The jurisdiction of the [STB] over—

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b). Congress defined "transportation" more broadly than the term's ordinary meaning; under the ICCTA, "transportation includes . . . a locomotive, car, vehicle, vessel,

warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail . . . ." 49 U.S.C. § 10102(9)(A).

Courts have characterized § 10501(b)'s preemptive scope as "broad and sweeping." *Chicago Transit Auth.*, 647 F.3d at 678 (collecting cases); *see also City of Auburn v. U.S. Gov't*, 154 F.3d 1023, 1030 (9th Cir. 1998) (rejecting argument that § 10501(b) preempts only economic regulation of railroads and noting case law supported "a broad reading of Congress's preemption intent, not a narrow one"); *CSX Transportation, Inc. v. Georgia Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996) ("It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations.") This broad reading is also supported by the "history and sequence of legislation in the area of railroad 'transportation,'" which reveals Congress's "considered policy" of deregulation and consolidation of remaining regulatory authority into federal hands. *Chicago Transit Auth.*, 2009 WL 448897, at *5-6 (concluding "Congress's actions were anything but cavalier"). However, it is also well-settled that although ICCTA's preemption language is unquestionably broad, "it does not encompass everything touching on railroads." *Delaware v. Surface Transp. Bd.*, 859 F.3d 16, 18 (D.C. Cir. 2017) (collecting cases). Notably, "the ICCTA does not [necessarily] usurp the right of state and local entities to impose appropriate public health and safety regulation on interstate railroads." *King Cty., Wa—Petition for Declaratory Order*, STB Finance Docket No. 32974, 1996 WL 545598, at *3 (S.T.B. Sept. 25, 1996); *see also Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005) (analyzing § 10501(b) and generally noting that "direct environmental regulations enacted for the protection of the public health and safety, and other generally applicable, non-discriminatory regulations and permit requirements would seem to withstand preemption").

Against this backdrop, the Seventh Circuit has adopted a two-tiered analysis offered by the STB to determine whether a state law or regulation is preempted by § 10501(b). Generally speaking, "there are two manners in which state or local actions could be preempted: (1) categorical, or *per se*, preemption, and (2) as-applied preemption." *Wedemeyer*, 850 F.3d at 894. "Categorical preemption occurs when a state or local action is preempted on its face despite its context or rationale." *Chicago Transit Auth.*, 647 F.3d at 679. The STB has explained that "two broad categories of state and local actions [are categorically] preempted regardless of the context or rationale for the action":

> The first is any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized . . .

> Second, there can be no state or local regulation of matters directly regulated by the Board—such as the construction, operation, and abandonment of rail lines (*see* 49 U.S.C. [§§] 10901-10907); railroad mergers, line acquisitions, and other forms of consolidation (*see* 49 U.S.C. [§§] 11321-11328); and railroad rates and service (*see* 49 U.S.C. [§§] 10501(b), 10701-10747, 1101-11124) . . . .

*CSX Transp., Inc.—Petition for Declaratory Order*, 2005 WL 1024490, at *2-3 (citations to supporting cases omitted). State and local laws that fall within one of these categories "are a *per se* unreasonable interference with interstate commerce. For such cases, once the parties have presented enough evidence to determine that an action falls within one of those categories, no further factual inquiry is needed." *Id*. at *3. "If an action is not categorically preempted, it may be preempted 'as applied' based on the degree of interference that the particular action has on railroad transportation—this occurs when the facts show that the action would have the effect of preventing or unreasonably interfering with railroad transportation." *Chicago Transit Auth.*, 647 F.3d at 679 (quotations omitted).

Here, ICCTA preemption depends on the effect PCB enforcement of Illinois noise emission standards would have on BRC's use of inert retarders. It is undisputed that BRC's use of inert retarders in its clearing yard constitutes "transportation by rail carrier" as defined by the ICCTA because the inert retarders qualify as "equipment . . . related to the movement of . . . property . . . by rail."[7] But this does not end the preemption inquiry. The real question is whether the PCB enforcement of the IEPA and its relevant regulations amounts to the kind of state action the ICCTA was intended to preempt.

### 1. Categorical Preemption

In applying the STB's framework to the instant case, the Court cannot say that PCB enforcement of Illinois' noise emissions rules here is categorically preempted. In short, the state action here is enforcement of generally applicable rules enacted under Illinois' police powers to protect public health and safety; these rules regulate noise emissions, not rail transportation. Further, the state action here does not fall into either *per se* category described by the STB. Accordingly, an "as applied" analysis is more appropriate.

Again, the relevant portions of the IEPA were enacted under the state's general police powers to protect public health and safety. *See* 415 ILCS 5/23. The IEPA prohibits any "person" (which includes entities like BRC) from emitting beyond its property boundaries "any noise that unreasonably interferes with the enjoyment of life or with lawful business or activity." 415 ILCS 5/24. A person violates this provision when it emits beyond its boundaries noise in excess of certain thresholds set by the PCB through regulation or noise deemed to unreasonably interfere with the life of others. *See* 415 ILCS 5/25; 35 Ill. Adm. Code § 900.102; 35 Ill. Adm. Code §§ 901.101-

---

[7] The parties also do not dispute that BRC qualifies as a "rail carrier" under the ICCTA. (*See* ECF No. 67 at ¶ 1.)

901.102.[8] To address noise violations, a private party like Weglarz can initiate a complaint before the PCB, *see Roti v. LTD Commodities*, 823 N.E.2d 636, 644 (Ill. App. 2d Dist. 2005), and after the PCB determines a violation has been committed, it can issue an order providing certain remedies, including "a direction to cease and desist from [noise] violations" (i.e., injunctive relief) and civil fines. 415 ILCS 5/33(b); *see also* 415 ILCS 5/42 (providing what fines may be imposed).

Again, the relevant provisions of the IEPA and its regulations—and by extension, Weglarz's complaint before the PCB—do not fall within either category of state regulation found to be preempted *per se*. They do not impose any type of "permitting or preclearance" requirement, i.e., requiring that BRC acquire any permit or type of approval *before* conducting its business (or for that matter any permit or approval to continue its business), and they also do not cover "matters directly regulated by the Board" (i.e., construction, operation, and abandonment of rail lines, railroad mergers, line acquisitions, and consolidation, or railroad rates and service). *CSX Transp., Inc.—Petition for Declaratory Order*, 2005 WL 1024490, at *2-3. Instead, these generally applicable rules are intended to regulate the noise BRC emits beyond the boundaries of its property. Tellingly, only when the IEPA and its regulations are *applied* to BRC—i.e., through the specific allegations in Weglarz's complaint—does it become clear that they could affect BRC's use of inert retarders. *See also Chicago Transit Auth.*, 647 F.3d at 679-80 (using "as applied" analysis after

---

[8] Regarding the second type of violation, the kind that unreasonably interferes with the lives of others, the PCB makes a determination after hearing evidence and considering certain specifically enumerated factors listed in the IEPA. *See* 415 ILCS 5/33(c); *see also Roti*, 823 N.E.2d at 644-45. Weglarz alleges both types of violations in its complaint before the PCB. Notably, the parties make no argument that these two types of violations should be analyzed separately. The Court sees some similarity between the second type of violation and permitting or preclearance actions recognized to be preempted *per se*, namely the level of discretion the state has to determine a violation. *See e.g., Green Mountain R. R. Corp. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005). BRC does not make this argument, so the Court does not consider it further. *See Doherty v. City of Chi.*, 75 F.3d 318, 324 (7th Cir. 1996).

noting that the condemnation at issue "is not a rule of general applicability because each instance necessarily varies with the facts of the case and the specific property subject to condemnation").

In arguing for summary judgment, BRC does not use the STB framework described above but argues that it is "neither necessary nor appropriate" to resort to an "as-applied" analysis. (*See* Pl.'s Memo. in Support of Summary Judgment at 5-8, ECF No. 58; *see also* Pl.'s Opp. to Summary Judgment at 11-13, ECF No. 64.) Instead, BRC contends that any state action that "may reasonably be said to have the effect of 'managing' or 'governing' rail transportation" is expressly preempted under § 10501(b). (*See* ECF No. 58 at 3-8.) BRC argues that, because PCB enforcement of Illinois noise emission standards would necessarily affect its current use of inert retarders, this constitutes "managing or governing rail transportation" and, thus, the action is preempted. (*Id.*)[9]

In making its argument, BRC quotes a *portion* of an oft-repeated interpretation of § 10501(b): "The ICCTA preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation, *while permitting the continued application of laws having a more remote or incidental effect on rail transportation*." *Delaware*, 859 F.3d at 18 (emphasis added); *see also Wichita Terminal Ass'n, B.N.S.F. R. Co. & Union Pac. R. Co.—Petition for Declaratory Order*, STB Finance Docket No. 35765, 2015 WL 3875937, at *4 (S.T.B. June 22, 2015) ("[S]tate or local actions that have the effect of managing or governing, and not merely incidentally affecting, rail transportation, are expressly or categorically preempted under § 10501(b)."); *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001)

---

[9] In a few passing sentences, BRC seems to suggest that PCB action here is also categorically preempted because it fits into the second category of *per se* category, i.e., PCB action overlaps with matters directly regulated by the STB. (*See* Pl.'s Resp. at 4, ECF No. 64; *see also* ECF No. 58 at 10.) To the extent BRC argues this point, the Court does not read the case law to support it. *CSX Transp., Inc.—Petition for Declaratory Order*, 2005 WL 1024490, at *2-3. More importantly though, the argument is perfunctory and underdeveloped. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . .").

(first formulating statement by using dictionary definition of "regulation"). BRC leaves out a crucial portion of the rule statement: § 10501(b) was not intended to preempt state actions "having a more remote or incidental effect on rail transportation." As explained above, the state action here regulates the noise BRC emits beyond its property; any effect the state action has on the equipment BRC uses to move property by rail—i.e., any effect on rail transportation—is incidental to the regulation of noise, at least when looking at the state action on its face. This is consistent with the view that the ICCTA was not intended to preempt all state exercise of traditional police powers, including "[generally applicable] direct environmental regulations enacted for the protection of the public health and safety." *Green Mountain R. R. Corp. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005); *see also Jackson*, 500 F.3d at 253; *Ass'n of Am. Railroads*, 622 F.3d at 1097-98.

As discussed below, the IEPA and its regulations *could* still amount to "regulation of rail transportation" and be preempted, but not on their face. If it were to accept BRC's argument, the Court does not understand the point of the STB and other courts, including the Seventh Circuit, articulating an "as applied" test at all. As the Seventh Circuit explained: "[w]hen considering a standard regulation—which is normally a rule of general applicability—using the Board's framework for both a categorical analysis and an 'as applied' analysis makes sense: the regulation may be categorically preempted on its face, or based on the specific facts of the case it may be preempted 'as applied' due to its effect on railroad transportation." 647 F.3d at 679. Indeed, in *Chicago Transit Auth.*, the Seventh Circuit concluded that the condemnation proceeding at issue was a "regulation" and that the railroad property at issue fell within the purview of the ICCTA but still proceeded to conduct an "as applied" analysis. *Id*. In its briefing, BRC has cited decisions outside this circuit that appear to have found state actions—including nuisance actions—categorically preempted, but the Court need not discuss each one. (*See* ECF No. 58 at 5-6.) In

essence, these cases do not address enforcement of generally applicable noise emission standards like those enacted under the IEPA, nor do these cases seem to actually adhere to the two-step preemption analysis adopted by the Seventh Circuit. For these reasons, the Court must proceed to an "as applied" analysis.

### 2. "As Applied" Preemption

Under an "as applied" analysis, the relevant question is whether enforcement of Illinois' noise emission standards "prevents or unreasonably interferes with railroad transportation." *Chicago Transit Auth.*, 647 F.3d at 680. At the outset, the Court notes a lack of relevant case law to help guide its analysis here, but generally, courts view the "as applied" test as a fact-intensive inquiry. *See Chicago Transit Auth.*, 2009 WL 448897, at *8 (noting "as applied" test is "more fact intensive"); *Jackson*, 500 F.3d at 253 ("This is a fact-intensive inquiry."); *Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141, 1144 (8th Cir. 2015) ("The [STB's] unreasonable-burden-or-interference test is fact intensive."). And quite candidly, BRC admits that "an as applied analysis often does not lend itself to summary judgment." (ECF No. 64 at 11-12.) That proves to be the case here; there are questions of fact that preclude summary judgment in either party's favor.

The Court begins with BRC's motion. As the plaintiff, BRC has the ultimate burden of proof to show that PCB action would prevent or unreasonably interfere with its operations. *See Washington Cty., Iowa*, 384 F.3d at 561 (placing burden of proof on railroad where railroad brought action seeking declaration that county's action was preempted by § 10501(b)); *see also City of Lincoln v. Surface Transp. Bd.*, 414 F.3d 858, 862 (8th Cir. 2005) (noting that allocation of burden of proof in *Washington Cty., Iowa* was proper because railroad brought the action); *Elam v. Kan. City S. Ry.*, 635 F.3d 796, 802 (5th Cir. 2011) (noting "[t]he party asserting federal preemption has the burden of persuasion" where railroad asserted § 10501(b) preemption as

defense to plaintiff's negligence claims). Essentially, BRC presents three grounds to show that the state action here would unreasonably interfere with its operations: (1) there are no viable alternatives for car securement if BRC was forced to change its current use of inert retarders; (2) BRC does not have adequate funding to implement "any alternative method of car securement" in place of its current inert retarders; and (3) enforcement of Illinois noise emissions standards would force BRC to adopt "non-standard operating procedures."

As to BRC's first point, the factual record, as it stands, cannot support summary judgment. Surprisingly, although both parties claim to have investigated alternatives for inert retarders that would reduce noise emissions, neither party offers evidence that attempts to definitively show what it would take for BRC to conduct its operations while complying with Illinois noise emission standards. BRC contends it has conducted an investigation of alternatives to its current use of double inert retarders (including unspecified European devices, "hydraulic" retarders, and a sound wall), and that BRC has determined these alternatives are not feasible or would be ineffective. (ECF No. 67 at ¶¶ 25-31.) Weglarz disputes these facts in varying ways, (*id.*), but even accepting BRC's proffered evidence at face value, it does not address one of Weglarz's proposed alternatives.

Weglarz proposes that BRC could reduce its noise emissions by removing the second set of inert retarders it installed between 2013 and 2015. (ECF No. 65 at ¶ 31.) Weglarz offers facts showing that, beginning in spring 2019, BRC actually began removing the second set of inert retarders on the tracks in the East Classification Yard and also began raising the grade of end tracks in the East Classification Yard, which is intended to increase resistance on rail cars moving along the tracks that will render the second set of retarders unnecessary. (*Id.* at ¶¶ 32, 37.) For both projects, BRC had to take a number of tracks out of service, and when BRC employees testified in May 2019, they testified that the grading project had not impacted the operational capacity of

BRC's clearing yard. (*Id*. at ¶¶ 32, 38-39.) Further, according to BRC personnel, removing the second set of inert retarders will likely reduce noise emitted from BRC's clearing yard, and BRC is undertaking a similar project in 2020 of raising the grade of end tracks and removing a second set of inert retarders in BRC's West Classification Yard. (*Id*. at ¶ 36, 41.)

To the extent BRC argues that none of these facts matter because there are no facts showing whether removing the second set of retarders will ensure BRC complies with Illinois noise emission regulations, this does not support summary judgment in favor of BRC because, again, BRC ultimately bears the burden of proof here. Moreover, there is evidence in the record that Weglarz first began receiving complaints of noise in the Spring of 2014, which prompted Weglarz to hire a noise expert; the expert conducted an investigation and issued a report concluding that BRC was violating Illinois noise regulations and attributed the source of the violation to BRC's use of inert retarders. (*Id*. at ¶ 20.)[10] Based on these facts, a trier of fact could reasonably infer that BRC was not violating Illinois noise emission standards until it installed the second set of inert retarders. Accordingly, on this record, the Court cannot grant summary judgment in favor of BRC based on a lack of viable alternatives to BRC's use of double inert retarders.

Regarding BRC's ability to fund implementing an alternative method, BRC offers employee testimony showing that BRC does not "have substantial spare cash on hand." (ECF No. 67 at ¶ 32.) BRC employees explain that BRC is owned by six railroads who account for 91 percent

---

[10] The report was drafted by William Bowlby of Bowlby & Associates and was attached to Weglarz's PCB Complaint, which in turn, was attached to BRC's Complaint. (*See generally* Ex. C, Bowlby & Associates Report, Ex. B, PCB Compl., ECF No. 1.) In its response to Weglarz's LR 56.1 Statement of Facts, BRC admits that the noise expert reached the conclusion that BRC violated the applicable noise regulations but "denies [the statement] that the noise is excessive as a legal conclusion." BRC further explained it "has no opinion at this time on whether those conclusions are correct or whether [the noise expert] used an appropriate methodology to reach them." (ECF No. 65 at ¶ 20.) This denial does not comport with LR 56.1, so the Court accepts as true for the purposes of deciding the instant motions that BRC violated applicable noise regulations. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *see also Trumbull v. SCI Illinois Servs., Inc.*, 575 F. App'x 683, 685 (7th Cir. 2014).

of BRC's business and that BRC sets its rates to break even, not make a profit. (*Id*.) Even accepting these facts as true, BRC admits that, in 2019, Illinois allocated $98 million to the Village of Bedford Park for noise abatement at BRC's clearing yard and that those funds are available to BRC for noise abatement. (ECF No. 65 at ¶¶ 46-47.) Further, BRC also admits that it has already begun work on projects relating to grading and removal of the double inert retarders. (*Id*. at ¶¶ 32, 37.) Moreover, BRC admits that, in 2019, Illinois allocated $98 million to the Village of Bedford Park for noise abatement at BRC's clearing yard and that those funds are available to BRC for noise abatement. (*Id*. at ¶¶ 46-47.) Based on this record, material factual disputes exist as to BRC's actual ability to fund noise abatement projects to comply with Illinois noise emissions standards. Further, to the extent BRC argues that it lacks the funding to pay any civil fines the PCB could impose—or that such fines would unreasonably interfere with BRC's operations regardless of BRC's ability to pay—neither the record nor relevant case law compel this conclusion. (*See id.*); *see also Jackson*, 500 F.3d at 255 (reversing decision that potential fine of $50,000 per day constituted unreasonable burden on railroad based on absence of evidence in the record showing that a fine would, in fact, be burdensome); *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126, 1134 (10th Cir. 2007) (finding that while "some potential remedies" could be preempted, the record did not show proposed remedies would have the effect of preventing or unreasonably interfering with railroad transportation).

Finally, BRC argues that complying with Illinois noise emission standards would necessarily force BRC to resort to "non-standard procedures" in operating its clearing yard. (*See* ECF No. 64 at 11-13; *see also* Pl.'s Reply at 5-6, ECF No. 75.) The Court need not linger long here. BRC's argument rests solely on the Seventh Circuit's decision in *Chicago Transit Authority*, 647 F.3d at 681. In that case, the Seventh Circuit found § 10501(b) preempted the CTA's attempt

to condemn part of a right of way it had long leased from a railroad; the CTA initiated condemnation proceedings so it could obtain a perpetual easement on the right of way (instead of paying increased rent to the railroad). *Id*. at 676-77. Using an "as applied" analysis, the Seventh Circuit found the action would prevent or unreasonably interfere with rail transportation. *Id*. at 680-81. Part of its reasoning in so concluding was that the railroad was forced to use "non-standard procedures" to maintain the right of way. *Id*. Because the CTA ran tracks on the leased portion of the right of way only a few feet beside the railroad's tracks that also ran on the right of way, the railroad had to modify its regular procedures to inspect and maintain its right of way. *Id*. Here, without providing detail, BRC argues the same conclusion must be drawn because PCB action would also force it to use non-standard procedures in its clearing yard in lieu of its double inert retarders. This is unpersuasive. It was the potential permanent loss of the railroad's right of way that did most of the heavy lifting in *Chicago Transit Authority*, and so the Court doubts that the specter of modifying certain unspecified practices is enough, on its own, to constitute unreasonable interference, at least in the absence of other support for this argument. Moreover, it is unclear from the record whether BRC would even have to resort to "non-standard procedures" now that the projects described above are underway (and may be complete).

Likewise, summary in favor of Weglarz is also inappropriate. Specifically regarding viable alternatives to the double inert retarders, Weglarz suggests two options: (1) removing the second set of inert retarders, as discussed above, and (2) replacing the current spring-type inert retarders with "hydraulic-activated inert retarders," which spend less time clamped onto rail cars' wheels (and by inference, produce noise for shorter periods of time than spring-loaded inert retarders). (*Id*. at ¶¶ 30-31, 42-45.) However, as BRC points out, Weglarz offers no facts showing that either of its proposed alternatives would ensure compliance with Illinois noise emissions standards. (*See*

*id*.) So, even assuming *arguendo* implementing these alternatives pose no burden to BRC, the Court still has to draw an inference that these alternatives would bring BRC in compliance with the applicable noise regulations, but the Court cannot draw this inference at summary judgment. More importantly though, as the parties' briefs make clear, whether replacing BRC's double inert retarders ultimately "prevents or unreasonably interferes" with BRC's operations is a broad question that requires weighing issues of effective alternatives, financial feasibility, and impact on daily operations. At summary judgment, it is improper for the Court to weigh all this evidence and render a conclusion; that is a job for the trier of fact. *Gibbs*, 755 F.3d at 536. Accordingly, the Court finds factual issues preclude summary judgment on the issue of § 10501(b) preemption and denies the cross-motions for summary judgment as to Count I.

## II.     Commerce Clause

Next, the Court turns to Weglarz's motion for summary judgment on BRC's Commerce Clause claim. Again, in Count II of BRC's complaint, BRC asks the Court to enjoin PCB enforcement of Illinois noise emission standards and declare that enforcement would violate the U.S. Constitution's Commerce Clause because it would impermissibly burden interstate commerce.

The Commerce Clause grants Congress the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. This provision provides "not only an affirmative authorization for Congress to regulate interstate commerce, but a corresponding restraint on the power of state and local governments to regulate that commerce." *Regan v. City of Hammond, Indiana*, 934 F.3d 700, 702 (7th Cir. 2019). "This restraint is referred to as the dormant commerce clause, and it precludes states and municipalities from erecting obstacles to interstate commerce even where Congress has not regulated." *Id*. But importantly, the dormant commerce clause "does

not apply to *every* state and local law that affects interstate commerce." *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 501 (7th Cir. 2017). "The fact that a state or municipal law affects interstate commerce in some way is by itself insufficient to render the law suspect under the commerce clause, as almost any local regulation is bound to touch upon interstate commerce." *Regan*, 934 F.3d at 702 (citing *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1130 (7th Cir. 1995)). Rather, "Dormant Commerce Clause doctrine applies only to laws that *discriminate* against interstate commerce, either expressly or in fact." *Park Pet Shop, Inc.*, 872 F.3d at 501.

State and local laws fall into one of three categories, "depending on the degree to which they affect interstate commerce: (1) laws that expressly discriminate against interstate commerce; (2) laws that, although neutral on their face, bear more heavily on interstate than local commerce; and (3) laws that may have a mild effect on interstate commerce but in practice do not give local firms any competitive advantage over firms located elsewhere." *Regan*, 934 F.3d at 702. A law falling into the first category is "presumed to be almost *per se* unconstitutional." *Id.* at 703. A law falling into the second category is analyzed according to its effect; "if the impact [on interstate commerce in comparison to local commerce] is so strong that the law effectively operates as an embargo on interstate commerce," it is subjected to the same scrutiny as the first category. *Id.*

A law that falls into the third category—i.e., a law that "regulates even-handedly and only incidentally burdens interstate commerce"—may be "examined under the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 847 (1970), to determine whether it is animated by a legitimate public purpose and, if so, whether the burden the law imposes on interstate commerce is excessive in relation to that interest." *Regan*, 934 F.3d at 703. As a general matter, *Pike*'s balancing test requires weighing evidence. *Baude v. Heath*, 538 F.3d 608, 612 (7th

Cir. 2008). However, the Seventh Circuit has made clear that "*Pike* is not the default standard of review for any state or local law that affects interstate commerce." *Park Pet Shop, Inc.*, 872 F.3d at 502. Rather, "*Pike* balancing is triggered *only* when the challenged law *discriminates* against interstate commerce in practical application." *Id.* 502. In this context, a law is discriminatory only if there is evidence that the law gives "local firms [a] competitive advantage over those located elsewhere" (i.e., those located out of state). *Park Pet Shop, Inc.*, 872 F.3d at 503-04. Absent such evidence, *Pike* is not applicable, and laws in the third category are subject only to a rational-basis standard of review. *Id.* (applying rational-basis review where plaintiffs did not plausibly allege that Chicago "puppy mill" ordinance favored Illinois breeders over out-of-state breeders); *see also Regan*, 934 F.3d at 703-05 (applying rational-basis review where plaintiffs failed to show that local ordinance favored in-state landlords over out-of-state landlords).

Here, the parties agree that application of the IEPA and its regulations fall into the third category but disagree whether the Court must conduct the *Pike* balancing test. (*See* ECF No. 56 at 19-20; *see also* ECF No. 64 at 13-14.) Based on *Park Pet Shop, Inc.* and *Regan*, the Court concludes it does not. Although BRC offers evidence showing BRC's role in the national rail network, (*see e.g.,* ECF No. 67 at ¶¶ 8-10), the Court is not aware of any evidence in the record showing that the IEPA, its regulations, or PCB enforcement of the two somehow attempt to bestow some type of advantage on local business or railroads at the expense of out-of-state businesses or railroads.

Accordingly, the Court applies a rational-basis standard of review. Under rational-basis review, a state law or regulation "comes to court bearing a strong presumption of validity, and the challenger must negative every conceivable basis which might support it." *Indiana Petroleum Marketers & Convenience Store Ass'n v. Cook*, 808 F.3d 318, 322 (7th Cir. 2015). "This is a

heavy legal lift for the challengers." *Id*. To uphold a law under rational-basis review, a court "need only find a reasonably conceivable state of facts that could provide a rational basis" for the law. *Id*. Applying this standard, the Court finds that the IEPA, its regulations, and the attendant PCB enforcement action withstand BRC's dormant commerce clause challenge. In enacting its noise controls, the Illinois General Assembly sought to protect the public's general health and well-being and the quality of the environment. 415 ILCS 5/23. These are "unquestionably legitimate governmental interests" and it is rational that the noise emission standards established by the IEPA and its regulations and enforced by the PCB will serve these interests. *See Park Pet Shop, Inc.*, 872 F.3d at 504 (rejecting dormant commerce clause claim where ordinance survived rational-basis review); *see also Regan*, 934 F.3d at 705 (affirming grant of summary judgment on dormant commerce clause claim after finding local ordinance "easily survive[d] deferential [rational-basis] review"). The Court grants Weglarz's motion for summary judgment as to BRC's commerce clause claim.

## III.    *Daubert* **Motion**

Finally, the Court addresses BRC's *Daubert* motion to strike Weglarz's expert witness, Ralph Lee Meadows. Broadly speaking, Meadows offers opinions relating to the feasibility of BRC adopting and implementing alternatives to its current use of double inert retarders in its clearing yard, particularly Weglarz's proposed alternatives of (1) removing the second set of inert retarders and (2) replacing the double inert retarders with "hydraulic-activated" inert retarders. BRC seeks to bar Meadows in totality, arguing that he is unqualified to offer his opinions, that his opinions are unreliable, and that his opinions are irrelevant.

The admissibility of expert witness testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579,

113 S. Ct. 2786 (1993). *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017) (quoting *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017)). Rule 702 and *Daubert* require "the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Krik*, 870 F.3d at 674. This gatekeeper function is important, in part, because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595. This is especially true in the context of a jury trial where a jury could be misled by an expert who is unqualified or who offers unreliable or irrelevant opinions. However, in the context of a bench trial, "the court's gatekeeping role is necessarily different" because the judge plays the role of the gatekeeper and the fact finder. *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006). Accordingly, the need to decide issues of admissibility prior to hearing the expert testimony is lessened. *Id.*; *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010) (reaffirming past holding that, in a bench trial, a court need not rule on admissibility of expert testimony before such evidence is presented). To be clear, this is not to say that the Court can consider opinions that do not meet the *Daubert* standard; Rule 702 determinations must be made at some point. *Id.* "[T]he point is only that the court can hear the evidence and make its reliability determinations during, rather than in advance of, trial." *In re Salem*, 465 F.3d at 777.

This matter is headed for a bench trial. The Court points this out because BRC seeks to bar Meadows entirely, which based on the Court's review of the parties' briefs and attached exhibits, is clearly not appropriate. While *some* of Meadows' opinions may prove to be unreliable or ultimately irrelevant, it is clear that other opinions meet the bar of admissibility. Because the parties' briefing does not adequately parse Meadows' opinions for specific ruling, the Court declines at this time to provide specific contours of what portions of Meadows' testimony is

admissible. Accordingly, the Court denies without prejudice BRC's motion to strike Meadows as an expert witness.

## **CONCLUSION**

For the foregoing reasons, the Court denies Plaintiff's motion for summary judgment [57] and denies Plaintiff's *Daubert* motion to strike Meadows as an expert witness [52]. The Court denies in part and grants in part Defendants' motion for summary judgment [53].

**SO ORDERED.**                                    **ENTERED: November 24, 2020**

**HON. JORGE ALONSO**
**United States District Judge**